CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 22 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| TIMOTHY H., | ) | |
| Plaintiff, | ) | Civil Action No. 4:17-cv-00048 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF | ) | By:   Joel C. Hoppe |
| SOCIAL SECURITY, | ) |        United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Timothy H. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying his application for supplemental security

income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381–

1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 11. Having

considered the administrative record, the parties' briefs, and the applicable law, I find that

substantial evidence supports the Commissioner's decision. Therefore, I recommend that the

Court deny Timothy H.'s Motion for Summary Judgment, ECF No. 14, grant the

Commissioner's Motion for Summary Judgment, ECF No. 19, and affirm the Commissioner's

final decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see*

*also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether

1

substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Timothy H. filed for SSI on May 31, 2013, alleging disability caused by back pain, hepatitis C, manic depressive symptoms, bipolar disorder, and memory loss. Administrative Record ("R.") 89, ECF No 9-1. Disability Determination Services ("DDS"), the state agency, denied his claim at the initial, R. 89–103, and reconsideration stages, R. 105–20. On February 5, 2016, Timothy H. appeared with counsel and testified at an administrative hearing before ALJ Theodore Annos. *See* R. 42–63. A vocational expert ("VE") also testified at this hearing regarding the nature of Timothy H.'s past work and the availability of other work he could perform in the national and regional economies. R. 56–61.

On February 29, 2016, ALJ Annos denied Timothy H.'s application in a written decision. R. 10–26. He determined that Timothy H. had severe impairments of "lumbar spine disorder, hepatitis C, obesity, affective disorders (depression and bipolar disorder), anxiety disorders (anxiety and panic disorder), and substance abuse (in remission.)" R. 12. None of these severe impairments, either alone or in combination, met or medically equaled a listing. R. 13–16. As part of the step-three analysis, ALJ Annos found that Timothy H. had mild restrictions in activities of daily living, mild difficulties in social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. R. 15.

As to Timothy H.'s residual functional capacity ("RFC"), the ALJ found that he could "perform light work as defined in 20 C.F.R. § 416.967(b)"[1] except he could "never . . . climb[] ladders, ropes, or scaffolds, and [was] limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs; occasional exposure to vibration and workplace hazards[;] . . . simple, routine, and repetitive tasks; and simple work-related decisions." R. 16; *see also* R. 16–24. Relying on this RFC finding and the VE's testimony, the ALJ found that although Timothy H. had no past relevant work, R. 24, he could perform certain light jobs, such as night cleaner, dining room attendant, and production assembler, that existed in significant numbers in the national and regional economies, R. 24–25. Therefore, ALJ Annos determined that Timothy H. had not been disabled since May 31, 2013. R. 26. The Appeals Council denied his request for review, R. 1–3, and this appeal followed.

### III. Discussion

Timothy H. challenges ALJ Annos's RFC assessment on three grounds. First, he asserts that the ALJ incorrectly weighed the opinion of the psychological consultative examiner Emilie Storch, Ph.D. Pl.'s Br. 2–17, ECF No. 15. Second, he argues that the ALJ failed to accommodate his moderate difficulties in concentration, persistence, or pace with an appropriate functional limitation in the RFC determination. *Id.* at 17–25. Third, he contends that the ALJ did not "consider the effect of depression on [his] pain, and vice versa." *Id.* at 25–26. These arguments are not persuasive.

A.    *Background*

1.    *Relevant Medical Evidence*

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can meet these lifting requirements can perform light work only if he can also "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

a.    *Back Pain*

Timothy H.'s back pain predates the relevant period. In January 2009, an MRI of his

lumbar spine revealed "multilevel broad base disc bulges without significant spinal stenosis or

neural foraminal narrowing" and "broad base disc bulge with a wide mouthed disc protrusion in

the right central/paracentral location at L1/L2 without evidence for significant neural

impingement." R. 336–37. Timothy H. received an epidural steroid injection ("ESI") at L4-L5 in

March 2009, R. 341, but he did not receive consistent treatment for his back pain. He did,

however, present to the emergency room on two occasions reporting radiating back pain. R. 344–

45 (Feb. 2010), 354 (May 2012). Findings on physical examination in February 2010 were

mixed with tenderness, decreased range of motion, and positive straight leg raise test on the

right, leading to a recommendation for physical therapy to help his range of motion, R. 344–45,

but Timothy H. did not follow through with this recommendation, R. 418–19. Findings in May

2012 were unremarkable, with negative straight leg raise test and normal reflexes despite some

"diffuse pain with palpation." R. 356 ("The back appears normal."). He also "demonstrate[d]

narcotic-seeking behavior, asking specifically for 'lortab 10s or [P]ercocet,'" in May 2012. *Id.*

(punctuation corrected).

Timothy H. continued to complain of and seek treatment for back pain during the

relevant period. R. 451, 504, 532, 535, 633, 635, 638, 640, 645, 649, 659–60. Findings on

contemporaneous physical examinations were largely unremarkable. Timothy H. displayed good

strength, limited or no tenderness to palpation along the spine,[2] normal reflexes, no edema, and

negative straight leg raise tests. R. 451–52, 633, 636, 641, 645, 659. He was also observed to

have no difficulty walking, and he could "heel and toe walk." R. 452, 633, 659; *see also* R. 466

---

[2] Some examinations revealed paralumbar tenderness and decreased range of motion, however. R. 633, 636, 659.

(no gait disturbance during visit for hepatitis C). On at least one occasion, the doctor remarked

that she "suspect[ed] either weakness secondary to pain or poor effort" regarding Timothy H.'s

display of strength. R. 452. Providers often diagnosed only back pain. R. 452, 533, 535, 634,

636, 639, 650, 660. Timothy H. primarily treated his back pain with ESIs, which often provided

significant relief. R. 532, 535, 634, 636, 639, 641. An emergency room doctor did not think it

necessary to order an X-ray of his back on December 30, 2015, given the limited findings on

physical examination. R. 645.

       b.    *Hepatitis C*

On September 19, 2012, Timothy H. established care as a "treatment naïve patient"[3] at

the Hepatitis Treatment Center, where he saw Nancy Downey, N.P. R. 392–97. His

comorbidities included depression and chronic back and leg pain, both of which he treated with

medications. R. 392. Timothy H. was eager to be treated for the viral infection and frustrated

with his lack of treatment so far because he had not been feeling well. *Id.* In October after a liver

biopsy, Timothy H. was diagnosed with chronic hepatitis C with minimal activity and no

fibrosis. R. 361–62, 380. In reviewing the results of the biopsy, NP Downey commented that the

"results indicate that patient does not need to be treated at this time." R. 397. Later in October,

NP Downey and Robert Brennan, M.D., wrote to Joseph Hostetler, M.D., one of Timothy H.'s

primary care physicians, and explained that "[f]ortunately for [Timothy H.], the biopsy

demonstrated 'minimal activity and no fibrosis.' Therefore, in light of his significant

comorbidities, it is appropriate to not treat his chronic Hepatitis C infection at this time." R. 391.

---

[3] "Naïve" means "not previously exposed to therapy or treatment." *Dorland's Illustrated Medical Dictionary* 1230 (32d ed. 2012). ALJ Annos incorrectly found that Timothy H.'s "treatment naïve" status meant he "did not require treatment for this condition." R. 19.

Timothy H. did not receive any treatment for his hepatitis C during the relevant period,

other than to present for annual visits with NP Downey and Dr. Brennan. R. 466 (Oct. 2013), 580

(Nov. 2014), 570 (Nov. 2015); *see also* R. 576 (May 2015 vaccination for hepatitis A and B).

During these annual visits, Timothy H.'s status remained "treatment naïve," and it was

confirmed that he was "not on treatment." R. 466, 570, 576, 580. Timothy H. repeatedly denied

experiencing any symptoms[4] or disease complications. *See id.* In October 2013, a comment in

Timothy H.'s chart noted that the most recent biopsy showed that his hepatitis C was "not very

active at [that] time," he had "no scarring in [his] liver," and his "liver [was] in good shape" and

"look[ed] good." R. 588. Timothy H. was informed that he did "not need to be treated at [that]

time" and could "wait until there [was] better treatment available." *Id.*; *see also* R. 576 ("Waiting

for interferon-free regimen." (spelling corrected)).

c.    *Mental Impairments*

During an intake visit at Danville-Pittsylvania Community Services in February 2012,

Timothy H. "appeared to be malingering, as he requested a doctor that would prescribe him

'what he needs.'" R. 438. He "instructed" that his paperwork be altered—e.g., by including his

hepatitis C and removing information related to his substance abuse—to improve his chances of

obtaining disability. *Id.* During this visit, he mentioned his pending disability application several

times and relayed that he wanted to "get everything done today." *Id.* It was recommended that

Timothy H. receive case management and substance abuse outpatient services, but he

"adamantly refused" both as he "only want[ed] to see the psychiatrist to get his medications and

---

[4] On April 29, 2014, Timothy H. reported "10 bouts of being sick in the last 42 day[s], with the primary
issue being" gastrointestinal upset, which he thought was related to his still untreated hepatitis C. R. 489.
No medical provider linked this reported symptom to hepatitis C, however.

'to get disability.'" R. 439–40. Timothy H.'s treatment for his mental impairments thus consisted of visits for medication refills. R. 431–37.

Timothy H. presented to his initial psychiatric evaluation with Don Tessmann, M.D., later in February 2012 with a folder of medical information and walking with a cane. R. 431. He left both items at the office after getting a prescription for Valium. *Id.* His mental status examination during this visit was unremarkable, and Timothy H. was diagnosed with major depressive disorder and polysubstance abuse. *Id.* During follow-up visits with Dr. Tessmann in May, August, and October 2012 and January and April 2013, mental status examinations were "essentially within normal limits" and Timothy H. often denied all symptoms. R. 433–37; *see also* R. 413, 425, 427 (normal mental status examinations during treatment with Dr. Hostetler). Timothy H. continued this treatment during the relevant period, with the first visit coming in August 2013. R. 487. His speech was normal, he had no obvious hallucinations, and he denied experiencing anxiety and depression. *Id.*

Timothy H. presented for a consultative psychological examination with Dr. Storch on September 23, 2013. R. 456–64. He reported experiencing back pain, bipolar illness/manic depression, extreme depression, anxiety, hepatitis C, social isolation, and poor memory. R. 456–57. Notably, he told Dr. Storch that for his hepatitis C, he would soon start treatment consisting of a liver biopsy followed by "one shot a week which causes extreme depression and nausea" and he would "likely be bedridden" for days or weeks at a time. R. 457; *see also* R. 462. During a normal day in September 2013, he got up around 10 a.m., would lie down (because of pain and depression) and read or listen to the radio, and got out of bed only to eat meals. R. 459. His back pain and bipolar illness prevented him from working. R. 460. On examination, he "answered questions quietly with minimal information" and "maintained some eye contact but mostly

looked down." *Id.* His speech had normal rate and no latencies, and he did not have difficulty

finding the right words. *Id.* He was oriented to person, place, and date, and he displayed insight

into his problems. *Id.* He had some memory difficulties in that he could not remember what he

had for dinner the prior night, but he "relate[d] an important story recently in the news";

"recalled three words immediately"; recalled two out of three words after eleven minutes, but

with a "significantly long delay"; and correctly named the current and past two presidents. R.

461. Timothy H. completed one serial seven, correctly spelled the word "world" backwards, and

correctly gave the months of the year in reverse order, but his "thought process was slow and

seemed controlled by pain." *Id.* His social judgment, fund of knowledge, and abstract reasoning

were "okay." *Id.* He had a logical and organized stream of thought without evidence of loose

associations, flight of ideas, or other indications of a psychotic process. *Id.* He did, however, note

that he believed other people talked about and plotted against him, and he had some thoughts of

suicide. *Id.*

Dr. Storch diagnosed bipolar illness, generalized anxiety disorder, panic disorder without

agoraphobia, attention deficit hyperactivity disorder combined type, and cocaine-related disorder

not otherwise specified. R. 462. She concluded that Timothy H.

> would [not] be able to perform detailed tasks [or] simple and repetitive tasks
> because he [could] hardly walk. He would be unlikely to maintain regular
> attendance in the workplace for psychological and physical reasons. Certainly, he
> would not be able to perform work activities on a consistent basis due to the same
> reasons. He would likely be able to perform work activities without additional
> supervision, and he would likely accept instructions from supervisors, but with his
> medical and psychiatric conditions, it is unlikely that he could complete a normal
> workday or workweek without interruptions from these. It is unlikely that he
> could interact well with coworkers and the public and certainly could not deal
> with the usual stresses encountered in competitive work, nor keep up the pace.

R. 463. Dr. Storch further noted that Timothy H. seemed "not always able to make reasonable

decisions," "[h]is thought content appeared to be full of pain," "[h]e has significant mental and

physical problems and, therefore, it is unlikely that he does see things clearly," and "[h]e certainly sees the world through the perception of pain." R. 460–61. She also emphasized his "unfortunate treatment program" for hepatitis C—which Timothy H. told her would likely "keep him bedridden, nauseous, and depressed for 12 to 24 weeks"—in finding that his hepatitis C required "a serious medication regimen that [would] render him nauseous and in pain for weeks." R. 462–63 (spelling corrected). Dr. Storch concluded that Timothy H.'s "prognosis for occupational functioning, personal functioning, and social functioning [was] extremely poor," R. 463, because "[t]he hepatitis C, the back pain, which is severe, and the psychological problems, which are multiple, [would] likely be difficult to change," R. 464.

On October 2, during a visit for his hepatitis C, NP Downey noted that Timothy H. "had difficulty following the conversation" and his "attention span was short." R. 466. Timothy H. continued treating with Dr. Tessmann through February 2015. R. 487–89, 514, 609–10. Findings on mental status examinations remained unremarkable and largely unchanged from each prior visit. *See id.* In April 2014, Timothy H. commented that he had not worked in years and that "his family [was] 'getting a little tired of it,' that is, supporting him." R. 489 (punctuation corrected). Dr. Tessmann noted that this revelation was "a somewhat different expression of how [Timothy H.] deals with life's issues." *Id.* (punctuation corrected). In November 2014, Dr. Tessmann noted that Timothy H. continued to "seek more valium." R. 609. In February 2015, Timothy H. presented to his appointment by himself, talked about "all the work and exercise that he" was doing, and explained that he "tapered his Cymbalta and Celexa in hopes of getting his valium increased." R. 610.

Timothy H. transferred from Dr. Tessmann to Laura DeNunzio, M.D., in May 2015. R. 611–12. On May 18, he told Dr. DeNunzio that he needed Valium for his anxiety and could not

function without it. R. 611. He also reported low energy and depressed mood. *Id.* On mental status examination, Timothy H. was cooperative and made good eye contact; he spoke at a normal rate, volume, and tone; thought processes were linear, logical, and goal-directed; thought content was within normal limits and there was no evidence of psychosis; insight was fair; judgment was fair to good; impulse control was good at the time of the interview; he denied suicidal and homicidal ideation; there was no evidence of movement disorder; mood was depressed; and affect was dysphoric. *Id.* Dr. DeNunzio started a trial of Abilify. R. 611–12. Timothy H. continued treating with Dr. DeNunzio through early 2016. R. 613–18, 676–77. His mood and affect fluctuated depending on his report of symptoms, *compare* R. 613, 617, 676 (mood reported to be "good" or "better" and affect observed as "full and reactive" or "euthymic"), *with* R. 615 (bad mood and dysphoric affect), but other findings on mental status examinations were unchanged, R. 613–18, 676. Abilify helped initially, R. 613, but its efficacy did not last, R. 615–18.

    2.    *DDS Investigative Report*

       On March 24, 2014, a law enforcement official with the state agency's Cooperative Disability Investigations Unit ("CDIU") completed a summary report of investigation regarding Timothy H.'s functioning. R. 473–76. The CDIU conducted the investigation after having Timothy H.'s claim referred because of his allegations of mental health deficits but no treatment history, inconsistent statements, and multiple disability applications. R. 474. A CDIU investigator interviewed two witnesses in conjunction with the report. The first witness, an employee at a local store, identified Timothy H. by his Virginia DMV photograph and stated that Timothy H. had been "a regular customer at their business over the past several years," coming into "the store four or five times a week for gas or other groceries." *Id.* The witness further noted

11

that Timothy H. had attended church regularly, but recently stopped. The CDIU investigator also interviewed a representative of the local U.S. Post Office, who identified Timothy H. by his DMV photograph. R. 475. The post office representative stated that Timothy H. had been "a regular customer at the post office for several years" and "often [came] in and pick[ed] up mail for an elderly lady who live[d] in the neighborhood." *Id.* Both witnesses attested that Timothy H. interacted with other customers in a polite and appropriate manner, "appear[ed] to function independently without assistance from anyone," and "appear[ed] to comprehend what people said to him by responding in an appropriate manner." R. 474–75. The store employee further noted that Timothy H. could shop unaccompanied. R. 475. The CDIU official's report concluded that Timothy H.'s "reported limitations were not congruent with the investigation." R. 474.

   *3.    DDS Opinions*

   Tony Constant, M.D., assessed Timothy H.'s functioning in April 2014 as part of the initial state agency review of his SSI application. R. 90–99. Dr. Constant concluded that Timothy H. could lift and carry twenty pounds occasionally and ten pounds frequently, sit about six hours and stand and/or walk about six hours in an eight-hour workday, and had unlimited ability to push and/or pull other than as shown for lift and carry. R. 98. Timothy H. could balance, stoop, and climb ramps and stairs frequently, and he could kneel, crouch, crawl, and climb ladders, ropes, and scaffolds occasionally. *Id.* On reconsideration review in November 2014, B. Duong, M.D., reaffirmed Dr. Constant's findings. R. 116–18.

   Regarding Timothy H.'s mental functioning, Jo McClain, Psy. D., conducted the initial review. R. 90–100. Dr. McClain found mild limitations in activities of daily living; mild difficulties in social functioning; moderate difficulties maintaining concentration, persistence, or pace; and one or two extended episodes of decompensation. R. 96 (paragraph B criteria). Dr.

McClain explained that "[t]he totality of medical and non-medical evidence in [the] file suggests that the claimant's credibility is highly questionable" and identified Timothy H.'s report of symptoms to Dr. Storch in particular as inconsistent "with the other mental health records in [the] file." R. 95. As for the mental RFC, Dr. McClain found that Timothy H. had "understanding and memory limitations" in that he was moderately limited in his abilities to understand and remember detailed instructions. R. 99. Dr. McClain explained, "[t]he medical evidence and statements in [the] file suggest[ed] that the claimant would not be significantly limited by his psychiatric condition in completing simple, repetitive tasks and following one- and two-step instructions." *Id.* (punctuation corrected). Dr. McClain also found sustained concentration and persistence limitations in that Timothy H. was moderately limited in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. R. 99–100. Dr. McClain explained, however, that "[t]he medical evidence and statements in [the] file suggest[ed] that the claimant would not be significantly compromised by his psychiatric condition in completing a normal workday, maintaining regular attendance, and working consistently over time." R. 100.

On reconsideration review, P. Walls, M.D., found that Timothy H.'s anxiety and affective disorders were "non-severe" medical impairments because they caused no more than "mild" limitations in the paragraph B criteria and only one or two extended episodes of decompensation. R. 115. Having found that the medical evidence did "not show any impairment severe enough to prevent [him] from performing basic work-related activities," R. 120, Dr. Walls did not complete a RFC assessment of Timothy H.'s mental abilities and limitations, R. 114–15.

13

4.    *Timothy H.'s Report of Symptoms and Testimony*

Timothy H. completed two function reports as part of his application for benefits. R. 239–46 (June 2013), 298–305 (Oct. 2014). He reported that he lived in a house with family and described an extremely limited routine of lying down the entire day, getting up only to eat. R. 239, 299. He would listen to the radio, watch television, or read when lying down. *Id.* His mother gave him his medication because he would forget to take it otherwise. R. 241, 300. He could not go out alone because he became confused as to how he got somewhere, and he did not do any shopping. R. 242, 301. He did not drive because of forgetfulness and numbness in his legs. *Id.* His only hobbies included reading and watching television, which he did daily. R. 243, 302. He did not go anywhere regularly. *Id.* He indicated that his functioning was extremely restricted, both physically and mentally. R. 244–45, 303–04. His mother completed two third-party function reports confirming Timothy H.'s description of symptoms and extremely limited daily activities. R. 248–58 (June 2013), 288–94 (Oct. 2014).

Timothy H. painted a similar picture at the administrative hearing in February 2016. R. 48–56, 61–62. He testified that he got hurt while working at Walmart in 2008 and had been in bed "70 to 75%" of the time since then. R. 50. He could not work anymore because his back pain and hepatitis C sapped him of strength. R. 53–54. He also had "a whole lot" of problems with depression and anxiety. R. 55. He lived with his mother, stepfather, and fourteen-year-old son, and he depended on his mother for many of his everyday needs. R. 48–49.

B.    *Analysis*

Timothy H.'s challenges all pertain to ALJ Annos's RFC finding. *See generally* Pl.'s Br. 2–17, 17–25, 25–26. A claimant's RFC represents his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite

14

his medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted);

*see* 20 C.F.R. § 416.945. It is a factual finding "made by the Commissioner based on all the

relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31

(4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of

impairments that are supported by the medical evidence or the claimant's credible reports of pain

or other symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC

assessment must "include a narrative discussion describing" how medical facts and nonmedical

evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why he

discounted any "obviously probative" evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567

F.2d 258, 259 (4th Cir. 1977), that supported the individual's claim for disability benefits, *Ezzell

v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017). This discussion should "build an accurate

and logical bridge from the evidence to his conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189

(4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant

retains a certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37.

    *1.    Dr. Storch's Opinion*

    Timothy H. first argues that ALJ Annos improperly assessed Dr. Storch's medical

opinion. Pl.'s Br. 2–17. Medical opinions are statements from "acceptable medical sources,"

such as physicians or psychologists, that reflect the source's judgments about the nature and

severity of the claimant's impairment, including his symptoms, diagnosis and prognosis,

functional limitations, and remaining abilities. 20 C.F.R. § 416.927(a)(1). In evaluating medical

opinions, including those from a non-treating consultative examiner, the ALJ must adequately

explain the weight he afforded the opinion, taking into account all relevant factors, such as the

nature and extent of the source's treatment relationship with the claimant; how well the source

explained or supported the opinion; the opinion's consistency with the record as a whole; and

whether the opinion pertains to the source's area of specialty. *Id.* § 416.927(c).

ALJ Annos gave two specific legitimate reasons for assigning Dr. Storch's opinion "little

weight," R. 22–23, both of which are adequately supported by the record. First, the ALJ

explained that Dr. Storch's "mental status examination findings [did] not support her opinion of

the claimant's vocationally relevant mental limitations." R. 22; *see Bishop v. Comm'r of Soc.*

*Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (substantial evidence supported ALJ's

decision to reject a treating physician's medical opinion "in its entirety" where the opinion was

"inconsistent with the mild to moderate diagnostic findings . . . and the generally normal findings

during physical examinations"). ALJ Annos noted that although Timothy H. was "acting

depressed because of his chronic pain," Dr. Storch's other findings of "appearing well-dressed

and cooperative with good eye contact, being oriented to person, place, and date, having intact

memory, having intact attention and concentration accurately completing serial seven testing and

spelling words backwards, having intact judgment and insight, having logical and organized

thought content and processes, and having an average fund of knowledge" constituted normal

examination findings. R. 22 (citing R. 460–62). ALJ Annos did not err in making such a

characterization.[5]

Timothy H. nonetheless argues that ALJ Annos ignored other relevant evidence from Dr.

Storch's mental status examination, including Timothy H.'s "'significantly long delay' in

---

[5] Timothy H. correctly points out that he did not have "good" eye contact during the examination, but rather "maintained some eye contact but mostly looked down." R. 460. *See* Pl.'s Br. 9. However, he does not explain how this minor misstatement undermines ALJ Annos's overall conclusion that Dr. Storch's objective findings on exam did not support her opinion of Timothy H.'s extremely limited "vocationally relevant mental limitations," R. 22. *Cf. Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (finding no reversible error where the claimant "failed to point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of his disability claim" (emphasis omitted)).

remembering certain words on the memory test" and Dr. Storch's observation that Timothy H.'s

"thought processes were slowed by pain," assignment of a Global Assessment of Functioning

("GAF") score of 45, and conclusion that Timothy H. had "significant mental and physical

problems." Pl.'s Br. 9 (citing R. 461). Timothy H.'s position is unavailing. Although a GAF

score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals,

frequent shoplifting) OR any serious impairment in social, occupational, or school functioning

(e.g., no friends, unable to keep a job)," GAF scores represent a "clinician's judgment of the

individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical*

*Manual of Mental Disorders* 32, 34 (4th ed. 2000). A GAF score is not an observable, abnormal

finding, but rather represents Dr. Storch's opinion of Timothy H.'s overall level of functioning,

which ALJ Annos reasonably found merited little weight.[6] Likewise, her statement that Timothy

H. had "significant mental and physical problems" is an overarching conclusion that ALJ Annos

was not obliged to accept. Moreover, the ALJ acknowledged Dr. Storch's specific functional

findings and diagnoses, so his omission of this characterization of Timothy H.'s problems does

not affect the analysis. The other two omitted aspects of Dr. Storch's opinion that Timothy H.

identified—i.e., delayed recall and slowed thought processes—are arguably abnormal findings

that ALJ Annos did not directly address. That said, it is not the role of this Court to reweigh the

evidence. *Carr v. Berryhill*, No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017)

("The Court cannot simply look at the same evidence and reverse the ALJ on the basis that it

could have reached a different result."). Because ALJ Annos accurately characterized the

majority of Dr. Storch's observations on mental status examination, and those findings are

---

[6] Moreover, the American Psychiatric Association has now dropped the GAF scale because of "its
conceptual lack of clarity . . . and questionable psychometrics in routine practice." Am. Psychiatric Ass'n,
*Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

inconsistent with the extreme limitations that she assessed, I must conclude that substantial

evidence supports the ALJ's decision to discount Dr. Storch's opinion for being inconsistent with

her own findings on mental status examination. *See Craig*, 76 F.3d at 590 (finding that

substantial evidence supported the ALJ's decision to reject a treating physician's opinion in part

because the opinion was not supported by the physician's own treatment notes).

Second, ALJ Annos explained that "Dr. Storch did not provide specific limitations

regarding [Timothy H.'s] mental limitations because she chose to focus on [his] exaggerated

physical complaints." The ALJ found this approach troubling because he also concluded that

Timothy H.'s "statements during the evaluation [with Dr. Storch] regarding his physical

limitations [were] not supported by the objective clinical findings of record." R. 22. In other

words, ALJ Annos discounted Dr. Storch's opinion because she based her conclusions primarily

on Timothy H.'s report of symptoms, reports which the ALJ  found to be not entirely credible.

*See* R. 17. Substantial evidence also supports this reason, which rests primarily on ALJ Annos's

credibility determination.

In conducting the credibility analysis, an ALJ must consider all the evidence in the record

bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a

medical impairment or related treatment; the ALJ cannot reject the claimant's description of his

symptoms "solely because the available objective medical evidence does not substantiate" that

description. 20 C.F.R. § 416.929(c); *see Lewis*, 858 F.3d at 866; *Hines*, 453 F.3d at 565. The

ALJ must give specific reasons, supported by "references to the evidence," for the weight

assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6

(W.D. Va. Oct. 21, 2013), and the ALJ's articulated reasons for discounting a claimant's

subjective complaints need only be legally adequate and supported by substantial evidence in the

record. *See Mascio*, 780 F.3d at 639; *Bishop*, 583 F. App'x at 68 (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

Here, ALJ Annos thoroughly explained his reasons for finding Timothy H.'s statements concerning the intensity, persistence, and limiting effects of his symptoms "not entirely credible" despite finding that Timothy H.'s "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." R. 17. Primarily, the ALJ concluded that the "evidence of record suggests that the claimant has greater functionality than alleged." *Id.* Substantial evidence supports this conclusion.

Regarding his physical functioning, Timothy H. asserted that he could walk no more than one hundred meters before needing a ten-minute rest and could not lift anything. R. 244, 303. He testified that he did not have enough strength to walk across the backyard and that he had no strength in his legs. R. 53–54. He stated that hepatitis C treatment kept him bedridden for days at a time and caused intense bouts of vomiting and nausea. R. 298, 457. He alleged that he generally spent his entire day lying in bed, getting up only to eat, R. 239, and indeed had been confined to his bed "70 to 75%" of the time since his May 2008 injury, R. 51, 305. As ALJ Annos explained, however, the record does not support these claims. For example, Timothy H. engaged in minimal and conservative treatment, consisting primarily of injections and limited narcotic pain medications, for his back. R. 18. It is well-settled that the ALJ may "consider the conservative nature of a plaintiff's treatment . . . in judging the credibility of the plaintiff." *Dunn v. Colvin*, 607 F. App'x 264, 273 (4th Cir. 2015); *see also Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication . . . and steroid injections, as 'conservative.'"), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016). Timothy H. did not

undergo *any* treatment for hepatitis C, and the ALJ noted that Timothy H.'s characterization of his alleged treatment as causing nausea, requiring shots, and leaving him bedridden was "clearly not an accurate description of the severity of his hepatitis C in light of the treatment records." R. 19. There can be no question that ALJ Annos properly assessed the record in this regard. R. 466, 570, 576, 580.

Additionally, the objective findings during examinations belie Timothy H.'s complaints of disabling symptoms. R. 18. Timothy H.'s physical examinations for his back were overwhelmingly unremarkable with negative straight leg raise tests and normal gait, balance, reflexes, and, on occasion, range of motion. *Id.* Likewise, diagnostic testing for his hepatitis C was not sufficiently concerning to warrant treatment, and he did not experience any disease complications. R. 19; *see also* R 466, 570, 576, 580. ALJ Annos did not need to accept Timothy H.'s allegations about his limitations "to the extent they [were] inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain" and other symptoms that he allegedly suffered. *Craig*, 76 F.3d at 595. ALJ Annos further noted that Timothy H. repeatedly exhibited drug-seeking behavior and that treatment notes "indicate[d] medical red flags regarding the sincerity of his symptoms." R. 18; *see also* R. 356, 431–32, 642–43. In discounting Timothy H.'s credibility, it was proper for the ALJ to rely on Timothy H.'s providers' notes questioning his sincerity and motives. Therefore, ALJ Annos did not err in concluding that "the objective diagnostic and clinical findings of record do not support the severity of [Timothy H.'s] complaints or his allegations of physical limitations." R. 19.

Similarly, the record does not support Timothy H.'s reports of mental health symptoms, Dr. Storch's conclusions notwithstanding. In his disability paperwork, Timothy H. reported

difficulty with concentration, memory, and attention. R. 241–44, 300–03. For example, he said that he would go out somewhere and forget how he got there, and his mother did not allow him to cook because he would forget to turn the stove off. R. 241–42, 300–01. At the administrative hearing, he testified that he had "a whole lot" of problems with depression and anxiety. R. 55. He painted a grim picture to Dr. Storch regarding anxiety, depression, paranoia, memory loss, and mood swings. R. 456–58. But, as ALJ Annos noted, Timothy H. refused ongoing mental health treatment and wanted to attend visits only to obtain medications. R. 19; *see Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (Luttig, J., concurring) (noting that "an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition" can bear heavily on the claimant's credibility). Timothy H. also requested that providers alter his records to improve his chances of obtaining disability. R. 19. As with his physical impairments, examination findings were unremarkable, R. 20; *Craig*, 76 F.3d at 595. There were also occasions in which Timothy H. denied experiencing depression and anxiety. R. 20; *see Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (finding that Fluellen's failure to report, or express denial of, relevant symptoms to her providers created "inconsistencies [that] support[ed] the ALJ's finding that Fluellen's symptoms and reported functional limitations were not as severe as alleged" (citing *Bishop*, 583 F. App'x at 68)). Therefore, substantial evidence supports ALJ Annos's finding that the record did not "support [Timothy H.'s] alleged symptoms and resulting mental limitations." R. 20.

Furthermore, ALJ Annos highlighted the stark inconsistencies between Timothy H.'s characterization of his treatment and daily activities with the other relevant evidence of record. ALJ Annos properly considered these inconsistencies. *See Vest v. Colvin*, No. 5:13cv67, 2014

WL 4656207, at *33–34 (W.D. Va. Sept. 16, 2014) ("There is no reason that Social Security

ALJs may not . . . consider a claimant's inconsistent statements in evaluating her credibility."

(collecting cases)). As noted above, Timothy H. told Dr. Storch that his anticipated treatment for

hepatitis C would likely cause incapacitating symptoms. The record, however, clearly shows that

Timothy H. never had any active treatment for hepatitis C. R. 466, 495, 504, 570, 576, 580.

Timothy H. also testified that he spent about three-quarters of his time since 2008 in bed, and he

reported that he could not do any tasks or activities beyond lying in bed, eating, listening to the

radio, watching television, and reading. *See, e.g.*, R. 239. He said he did not drive or go out

alone. *See, e.g.*, R. 242. The CDIU report, however, documented statements from two third-party

witnesses who regularly observed Timothy H. patronizing their respective establishments,

functioning independently, and interacting appropriately with others. R. 474–75. Timothy H.

attended multiple treatment visits by himself. R. 354, 451, 610. Indeed, the only treatment notes

in the record indicating that he was accompanied by someone else came from Dr. Storch's

consultative examination when he presented with his father. He also told his providers that he

had no problem completing household tasks. R. 570. And he reported working and exercising

regularly. R. 610. Again, the ALJ need not accept Timothy H.'s allegations that are inconsistent

with the available evidence. *Craig*, 76 F.3d at 595; 20 C.F.R. 416.929(c). Therefore, ALJ Annos

did not err in concluding that "the record reflect[ed] that the claimant [was] capable of

independently performing his activities of daily living." R. 17.

Having concluded that substantial evidence supports ALJ Annos's credibility assessment,

one can readily ascertain that substantial evidence also supports his second reason for

discounting Dr. Storch's opinion, i.e., that she improperly focused on Timothy H.'s exaggerated

reports of physical limitations in rendering her conclusions. "An ALJ . . . may question a

physician's opinion that relies on a patient's report of symptoms, especially where the ALJ has found the patient's statements regarding the intensity of his symptoms to be less than credible." *Weaver v. Colvin*, No. 3:15cv26, 2016 WL 4768841, at \*11 (W.D. Va. Sept. 13, 2016) (citing *Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003)). Here, Dr. Storch's opinion explicitly relied on Timothy H.'s characterization of his condition, *see, e.g.*, R. 460, 462–63 (accepting Timothy H.'s report of "very few" daily activities and his report that he "rarely does anything other than lie in the bed and read due to his pain and depression"), 462 (accepting that Timothy H. was "preparing to be treated for [his hepatitis C] with an unfortunate treatment program"), and her conclusions reflected that reliance, *see, e.g.*, R. 462 (noting that he "definitely evidences a history of bipolar illness and anxiety"),463 (concluding that he could not "perform detailed tasks [or] simple and repetitive tasks because he [could] hardly walk"). *See also* R. 95 (Dr. McClain explaining that Dr. Storch's opinion was "fundamentally based on the claimant's self-report and [was] not an accurate picture of the nature of his psychiatric condition" compared to the objective evidence and "other mental health records in [the] file"). ALJ Annos, conversely, had the benefit of the entire record, which he reasonably found cast doubt on the veracity of Timothy H.'s statements to Dr. Storch. The ALJ credited the other relevant evidence of record over Timothy H.'s allegations, as was his prerogative. *See Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)) ("[T]he Fourth Circuit has also admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in the evidence."). Therefore, ALJ Annos did not err in assigning little weight to Dr. Storch's opinion insofar as he concluded that she "did not consider her own findings or the preponderance of objective clinical findings of record, [but] instead used the claimant's subjective complaints as factual when articulating her opinion." R. 23.

23

2.    *Concentration, Persistence, and Pace*

Timothy H. next invokes the Fourth Circuit's decision in *Mascio v. Colvin*, 780 F.3d 632
(4th Cir. 2015), by arguing that ALJ Annos "erred by failing to account for [his] moderate
limitation of concentration, persistence, and pace in the hypothetical question and by failing to
explain why [he] can do simple, routine, repetitive work despite this limitation." Pl.'s Br. 17.
Specifically, Timothy H. contends that if the ALJ determines that a claimant can do simple,
routine tasks despite a moderate limitation in concentration, persistence, or pace, "the ALJ must
provide an explanation of *why* he thinks so." *Id.* Timothy H. contends that ALJ Annos provided
no such explanation, but rather relied exclusively on the "conclusory" opinion of DDS expert Dr.
McClain. *See id.* at 17–25. Timothy H. further faults Dr. McClain for relying on an unidentified
third-party witness from the CDIU report in reaching her conclusions, even though the ALJ
rejected the observations of Timothy H.'s mother, another third-party witness. *Id.* at 20–25.
Timothy H.'s arguments are not persuasive.

Like in *Mascio*, ALJ Annos found at step three that Timothy H. had moderate difficulties
maintaining concentration, persistence, or pace. R. 15. The ALJ reaffirmed this finding in
discussing the DDS opinions. He gave great weight to Dr. McClain's opinion, which also found
a moderate limitation in maintaining concentration, persistence, or pace. R. 21. On
reconsideration, Dr. Walls found mild limitation in maintaining concentration, persistence, or
pace and no severe mental impairment. The ALJ gave Dr. Walls's opinion partial weight because
it "understate[d] the claimant's limitations as to concentration, persistence, and pace," but it was
otherwise "consistent with the evidence of record." R. 22.

Considering the ALJ's analysis under the framework in *Mascio*, there is a surface-level
inconsistency between ALJ Annos's step-three finding and the RFC limiting Timothy H. to

24

simple, routine, and repetitive tasks. 780 F.3d at 638 ("[T]he ability to perform simple tasks

differs from the ability to stay on task. Only the latter limitation [will] account for a claimant's

[moderate] limitation in concentration, persistence, or pace."). The former finding necessarily

establishes some deficit in Timothy H.'s "ability to sustain focused attention and concentration"

long enough "to permit the timely and appropriate completion of tasks commonly found in work

settings." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(3) (2015); *see Petty v. Colvin*, 204 F.

Supp. 3d 196, 206 (D.D.C. 2016). Thus, ALJ Annos's subsequent RFC determination must either

account for this deficit or adequately explain why, notwithstanding his earlier finding, Timothy

H.'s overall limitations actually "do not affect [his] capacity to sustain simple, routine, or

unskilled work." *Perdue v. Colvin*, No. 7:14cv173, 2015 WL 5771813, at *6 (W.D. Va. Sept. 30,

2015) (citing *Mascio*, 780 F.3d at 638). He can satisfy that obligation by providing a sufficiently

detailed "analysis that allows the court to ascertain why the ALJ found moderate difficulties at

step three," making an RFC finding "that explicitly accounts for those difficulties," or including

a sufficiently detailed explanation "that clarifies why the moderate difficulties" found at step

three "do not result in any specific limitations in the claimant's RFC." *Powell v. Comm'r, Soc.

Sec. Admin.*, Civ. No. SAG-14-3233, 2015 WL 4715280, at *2 (D. Md. Aug. 6, 2015).

    Ultimately, ALJ Annos's written decision satisfied this standard. First, it is sufficiently

clear that he based his step-three finding solely on Timothy H.'s subjective statements,

particularly his reported difficulty with "attention and memory." R. 15. The ALJ found that

Timothy H. nevertheless could independently perform activities of daily living, including having

custody of his fourteen-year-old son, running errands for his neighbors, working informally,

reading for enjoyment, and attending medical appointments. *Id.* As discussed above, substantial

evidence supports the ALJ's characterization of Timothy H. being capable of independently performing activities of daily living.

Moving to his review of the medical evidence, ALJ Annos focused on the unremarkable findings on mental examination and Timothy's H.'s preference for taking medications, his drug-seeking behavior, and his adamant refusal to participate in mental-health therapy or counseling. R. 19–20. This evidence showed that Timothy H.'s symptoms did not limit his functioning to the degree he claimed. R. 21. ALJ Annos's conclusion regarding Timothy H.'s activities of daily living then informed his decision not to include any specific limitation in the RFC to account for Timothy H.'s moderate difficulties in maintaining concentration, persistence, or pace. Notably, in assigning Dr. McClain's opinion great weight, the ALJ explained that the record revealed Timothy H. was "capable of concentrating and focusing on tasks based on his level of independent functioning." R. 21. Similarly, Dr. McClain explained that Timothy H. "would not be significantly limited by his psychiatric condition in completing simple, repetitive tasks and following one- and two-step instructions." R. 99 (punctuation corrected).

The ALJ's written decision makes clear that although he found Timothy H. moderately limited in his ability to maintain concentration, persistence, or pace based on Timothy H.'s self-reported difficulty with memory and attention, he concluded that other evidence in the record showed that Timothy H. could nonetheless concentrate sufficiently to perform simple tasks. For example, the CDIU report contained evidence that Timothy H. frequented at least two commercial establishments several times a week by himself and interacted appropriately with customers and staff. These factual observations contradict his reports that he stayed in bed three-quarters of the time and needed someone to accompany him whenever he went out. Additionally, Timothy H. told providers that he had no trouble completing housework and that he exercised

and worked regularly, R. 570, 610, which contradicts his reports that he could not do any house or yardwork and did nothing beyond reading, watching television, and listening to the radio. Further, the ALJ's discussion of the medical record shows that he relied on the lack of both treatment and abnormal findings in discounting Timothy H.'s claimed limitations and in finding that Timothy H. could perform simple tasks despite his concentration problems.

This discussion sufficiently explains why ALJ Annos "believe[d] that [Timothy H.'s] impairments in concentration, persistence, and pace [did] not affect [his] capacity for simple, routine," and repetitive work. *Perdue*, 2015 WL 5771813, at *6. It follows, then, that substantial evidence supports ALJ Annos's conclusion that no further limitations in the RFC were warranted to account for Timothy H.'s moderate difficulties with maintaining concentration, persistence, or pace because he retained a sufficient functional ability to concentrate and focus on these tasks. Put another way, ALJ Annos's discussion allows the Court to ascertain "the rationale underlying the apparent discrepancy" between his step-three finding of moderate difficulties maintaining concentration, persistence, or pace and a subsequent RFC finding "that does not, on its face, account for such difficulties." *Powell*, 2015 WL 4715280, at *2. Thus, ALJ Annos did not violate *Mascio*.[7]

>    3.    *Combined Effects of Impairments*

---

[7] Timothy H. also contends that "the Commissioner tries to have it both ways" by crediting third-party witnesses favorable to a non-disability finding, i.e., the witnesses in the CDIU report, while discounting third-party witnesses favorable to the claimant, i.e., Timothy H.'s mother. *See* Pl.'s Br. 20–25. ALJ Annos found credible the evidence in the CDIU report in large part because the unnamed witnesses had no apparent interest in the outcome of the case. R. 24. Conversely, the ALJ determined that Timothy H.'s mother would have some interest in the outcome. That is a reasonable determination, and one within the ALJ's discretion to make. The ALJ questioned the mother's statement on the additional ground that her "accounts [were] overly restrictive and inconsistent with the objective medical evidence." R. 24. Indeed, Timothy H.'s mother espoused essentially the same limitations reported by Timothy H. *See, e.g.*, R. 292, 303 (reporting that Timothy H. could walk only twenty yards before needing to rest for three minutes). As the ALJ reasonably discounted the credibility of Timothy H.'s report of symptoms, regardless of the weight the ALJ assigned the CDIU report, the ALJ did not err in affording little weight to the mother's similar statements.

Timothy H. last argues that ALJ Annos "erred by failing to consider the effect of depression on [his] pain and vice versa." Pl.'s Br. 25. Other than stating that "pain can cause [or exacerbate] depression" and "depression can greatly exacerbate physical pain," *id.*, Timothy H. does not develop this argument. Indeed, he does not "point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of his disability claim." *Reid*, 769 F.3d at 865 (emphasis omitted). Without such development or supporting evidence, it is difficult to decipher exactly which aspect of the ALJ's decision Timothy H. is trying to challenge. If Timothy H. asserts a general challenge to the RFC because he thinks the ALJ did not properly consider the combined functionally limiting effects of his medical impairments, this argument fails because the ALJ's decision makes clear that he "both identif[ied] evidence that support[ed] his conclusion and buil[t] an accurate and logical bridge from that evidence to [his] conclusion" that Timothy H. was not disabled. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted). If, as the Commissioner understood, Def.'s Br. 24–26, ECF No. 20, Timothy H. asserts a general credibility challenge, this argument fails because, as discussed, ALJ Annos properly evaluated Timothy H.'s credibility. Therefore, I cannot conclude that the ALJ erred by not explicitly considering the combined effects of Timothy H.'s depression and pain. Remand is not warranted on this ground.

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **DENY** Timothy H.'s Motion for Summary Judgment, ECF No. 14, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 19, **AFFIRM** the Commissioner's final decision, and **DISMISS** the case from the Court's active docket.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 22, 2018

Joel C. Hoppe
United States Magistrate Judge

29